United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>SANTOS RENE SOTO and SANTOS<br>MOISES SOTO,<br><br>    Defendants. | Case No.  22-cr-00378-WHO<br><br>**ORDER REGARDING DEFENDANTS'<br>MOTIONS TO DISMISS, STRIKE, AND<br>SEVER**<br><br>Re: Dkt. Nos. 72, 73, 75, 76, 77, 79, 80, 83,<br>86, 87, 89 |

Defendants Santos Rene Soto ("Santos Soto" or "father") and Santos Moises "Saints" Soto III ("Saints Soto" or "son") bring three motions against the United States in their ongoing criminal wire fraud case. They first move to dismiss Counts One and Two of their indictment (the "Indictment") because they believe these counts violate the Rule Against Duplicity and are impermissibly vague. They also seek to strike the non-disclosure theory of fraud from Counts One through Five of the Indictment on the basis that they are inadequately pleaded, and the "among other things" language in Count One for vagueness. Finally, they seek to sever Counts Six and Seven from this case, as well as from each other, so that Santos Soto can provide potentially exculpatory testimony at Saints Soto's trial.

The defendants' motions are DENIED, except for the motion to strike the "among other things" language in Count One, which is GRANTED. Their motion to dismiss claim fails because conspiracy charges are routinely found not to violate the Rule Against Duplicity. Their motion to strike the non-disclosure theory of fraud similarly fails, as the government provides enough facts in the Indictment to properly support their theory. As for the motion to sever, I believe the record needs to be further developed before deciding this matter. I decline to sever the defendants' claims at this time but will reconsider this issue closer to trial.

United States District Court
Northern District of California

## BACKGROUND: THE INDICTMENT

Saints Soto is the CEO of GoldenSpear LLC ("GoldenSpear"), an artificial intelligence ("AI") technology company founded in 2009 and based in San Francisco, California and Barcelona, Spain.  Indictment ("Indict.") [Dkt. No. 1] ¶ 1.  He is also the CEO of AI Health, "a subsidiary of GoldenSpear that purports to be an AI technology company focused on healthcare and founded in approximately 2021."  *Id.* ¶ 3.  Santos Soto is the father of Saints Soto and serves on the board of directors for GoldenSpear.  *Id.* ¶ 2.  Both defendants hold "joint ownership of and control over, and [are] signatories for," bank accounts belonging to GoldenSpear and AI Health.  *Id.* ¶¶ 4–5.

The government alleges that the Sotos conspired to defraud investors and banks by making false representations about their companies, resulting in three fraudulent events—the "GoldenSpear" incident, occurring from March 2017 to May 2019; the "AI Health" incident, occurring from March 2021 to April 2022; and the "PPP loan" incident, occurring from April 2020 to May 2020 (together, the "three schemes").  *See* Indict. ¶¶ 34–50. Counts One and Two of the Indictment are related to all three schemes, while Counts Three through Seven are each only connected to one of the three schemes.  *See id.*  The schemes as alleged in the Indictment are summarized below.

### 1.  The GoldenSpear Fraud

In 2017, defendants told investors and potential investors that GoldenSpear was an "AI company with a focus on fashion and retail," and that the company had created an "AI Fashion Assistant that used visual and textual algorithms to help retailers identify specific fashion brands and types of clothing that potential customers might want to purchase."  *Id.* ¶ 13 (internal quotations omitted).  To induce potential investors to finance GoldenSpear, Saints Soto allegedly made misrepresentations that the company "entered into contracts with, had discussed investments from or acquisitions by, or was otherwise working with numerous established entities."  *Id.* ¶ 14.

One investor Saints Soto communicated with was "T.G."  *Id.* ¶ 15.  In January 2018, Saints Soto told T.G. that "GoldenSpear was 'selected' by a prominent car manufacturer to power a global intelligent Dealership Network," despite never having been selected to perform work for

the company. *Id.* (cleaned up). He also represented to T.G. that a "prominent financial firm" took GoldenSpear on a "roadshow" to meet with prominent technology companies, who offered to invest in GoldenSpear. *Id.* ¶ 16. But the roadshow and offers were allegedly a lie made up by Saints Soto. *Id.* Influenced by these misrepresentations, T.G. invested approximately $300,000 in GoldenSpear between February 2018 and May 2019. *Id.* ¶ 17.

### 2. The AI Health Fraud

When the COVID-19 pandemic exploded in March 2020, the "purported business model of GoldenSpear, which the defendants told investors involved brick-and-mortar stores, became untenable." United States' Opposition to Motions to Strike, Dismiss, and Sever ("Oppo.") [Dkt. No. 83] at 6. As a result, defendants "began to represent to potential investors that GoldenSpear was moving from the fashion sector to the health sector." Indict. ¶ 18. Such representations included that AI Health developed a "wearable device that, using artificial intelligence, could detect the presence of the COVID-19 virus in the wearer of the device." *Id.*

Around March 2021, Saints Soto sent to investor J.B. a presentation that stated AI Health "gifted" its technology to a high school in Los Angeles, California, despite never sending such items. *Id.* ¶ 19. At the same time, Saints Soto told J.B. that a "prominent accounting and violation firm had conducted a valuation of AI Health and . . . valued the company at more than $100 million." *Id.* (cleaned up). He also represented that he was collaborating with a children's hospital in Los Angeles to study patient health data in connection with the COVID-19 pandemic. *Id.* Both of these claims were false. *Id.* Influenced by these misrepresentations, J.B. invested approximately $250,000 in AI Health in May 2021. *Id.* ¶ 21.

Saints Soto made the same misrepresentations to potential investor E.C. in 2022, along with new claims that AI Health entered a contract with a prominent medical device company to assist with a diabetes prevention study being conducted in Guam. *Id.* ¶¶ 23–24. As a result, E.C. invested approximately $2.67 million in AI Health. *Id.* ¶ 25.

### 3. The PPP Loan Fraud

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which created an emergency loan system called the Paycheck Protection

Program ("PPP"). *Id.* ¶ 7. The PPP sought to provide $300 billion to "small businesses for job retention and certain other expenses" during the COVID-19 pandemic. *Id.* ¶ 7. To qualify for a PPP loan, businesses were required to submit a form application stating their (1) monthly payroll expenses and (2) number of employees. *Id.* ¶ 8. Loans would then be calculated based on these numbers, and proceeds were required to be spent on "certain permissible expenses," including "payroll costs, interest on mortgages, rent, and utilities." *Id.* ¶¶ 8, 11.

On April 20, 2020, GoldenSpear applied for an PPP loan. *Id.* ¶ 27. On its application, GoldenSpear listed the person submitting the application as "Santos Soto."[1] *Id.* ¶ 28. The form included Santos Soto's email and home addresses but listed Saints Soto's social security number and birthdate. *Id.* ¶¶ 28, 33. In the application, defendants indicated that the monthly payroll for GoldenSpear was $267,899.16, and that GoldenSpear had thirty-three employees working in the United States. *Id.* ¶ 29. Defendants certified that the information they provided was true and accurate. *Id.* In reality, GoldenSpear only had seven or eight employees working in the United States, and their average monthly payroll was between $57,000 to $67,000. *Id.* ¶ 32. Based on the numbers they provided, defendants received a loan for $669,700, which was later wired to the GoldenSpear bank account. *Id.* ¶ 30.

Defendants also stated in their application that the PPP loan would be used to pay GoldenSpear's $18,000 per month commercial lease. *Id.* ¶ 33. However, the address the defendants provided was Santos Sotos' private residence; the loan was never used to pay for a commercial lease. *Id.*

## PROCEDURAL HISTORY

On September 28, 2022, the United States filed the Indictment against defendants in the Northern District of California, bringing seven charges against them: (1) Conspiracy, in violation of 18 U.S.C. § 371; (2) Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349; (3) Wire Fraud, in violation of 18 U.S.C. § 1343 (GoldenSpear fraud with victim "T.G."); (4) bank fraud under 18 U.S.C. § 1343 (AI Health fraud with victim "J.B."); (5) Wire Fraud, in violation of 18 U.S.C. §

[1] Because both defendants have "Santos Soto" in their names—Santos Moises Soto III and Santos Renee Soto—the Indictment does not identify which defendant submitted the application.

United States District Court
Northern District of California

1343 (AI Health fraud with victim "E.C."); (6) Bank Fraud, in violation of 18 U.S.C. § 1344(2) (PPP Fraud); and (7) False Statement on a Loan Application, in violation of 18 U.S.C. § 10104 (PPP Fraud). *See* Indict.

In response to the Indictment, defendants filed three motions. Saints Soto filed a motion seeking to dismiss Counts One and Two of the Indictment for violating the Rule of Duplicity, or, in the alternative, a motion requesting a bill of particulars for Count Two. *See* Defendant Soto III's Motion to Dismiss Counts One and Two of Indictment, and as to Count Two in the Alternative for a Bill of Particulars ("Dismiss Mot.") [Dkt. 72].[2] He also filed a second motion seeking to strike the "non-disclosure" theory of prosecution from Counts One through Five of the Indictment. *See* Defendant Soto III's Motion to Strike "Non-Disclosure" Theory of Prosecution ("Strike Mot.") [Dkt. 73]. Santos Soto filed two motions, requesting that he be joined to Saints Soto's respective motions. *See* Dkt. Nos. 75, 76.

A few days later, Saints Soto filed a third motion to sever Counts Six and Seven from theo other counts, as well as from each other. *See* Motion to Sever Defendant on Counts Six and Seven from Trial and All Other Counts ("Sever Mot.") [Dkt. No. 79]. Santos Soto filed a declaration in support of Saints Soto's motion to sever. *See* Administrative Motion to File Under Seal ("Sealed Mot.") [Dkt. No. 78] Declaration of Santos Moises Soto, III ("Saints Soto Decl.") [Dkt. No. 78-1]. He then filed a request to join Saints Soto's severance motion. *See* Dkt. No. 80.

The United States responded to all three motions in a single opposition. *See* Oppo. Defendants subsequently filed three replies. They filed two responses regarding the motion to dismiss and motion to strike claims. *See* Defendants' Reply on Motion to Dismiss ("Dismiss Repl.") [Dkt. No. 86]; Defendants' Reply on Motion to Strike ("Strike Repl.") [Dkt. No. 87]. Three days later, they filed their reply in support of the severance motion. *See* Reply Brief in Support of Motion to Sever Trial ("Sever Repl.") [Dkt. No. 89].

---

[2] Defendants withdrew their request for a bill of particulars at oral argument, as the government clarified that the scope of Count Two is the same as Count One.

**LEGAL STANDARD**

**Motion to Dismiss; Motion to Strike**

Review of an indictment on a motion to challenge the sufficiency of the pleading is governed by Federal Rule of Criminal Procedure 7(c), which provides that an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In considering a motion to dismiss an indictment, district courts are limited to the "four corners of the indictment" in analyzing whether a cognizable offense has been charged. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quotation and citation omitted).

"Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers*, 751 F.2d 1074, 1076 (9th Cir. 1985). As a result, an indictment will withstand a defendant's motion to dismiss so long as it "contains the elements of the charged offense in sufficient detail (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge." *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994) (citation omitted).

**Motion to Sever**

Under Federal Rule of Criminal Procedure 8(a), joinder of two or more offenses may occur when the offenses charged are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Only one of the three prongs must be met for joinder to be proper. *See id.*; *United States v. Jawara*, 474 F.3d 565, 578 (9th Cir. 2007). That is because joinder "is the rule, severance the exception." *United States v. Free*, 841 F.2d 321, 324 n.1 (9th Cir. 1988). But these factors are "not infinitely elastic," and there must be a "valid basis for joinder . . . discernible from the face of the indictment." *Jawara*, 474 F.3d at 473 (citing *United States v. Randazzo*, 80 F.3d 623, 627 (1st

United States District Court
Northern District of California

1  Cir. 1996)).

2      Even if joinder is proper under Rule 8(a), district courts may sever a claim or defendant if

3  joinder "prejudice[s] a defendant or the government." Fed. R. Crim. P. 14(a).  In general, courts

4  prefer that "defendants who are indicted together" are also tried jointly.  *Zafiro v. United States*,

5  506 U.S. 534, 537 (1993).  But severance is appropriate under Rule 14(a) "if there is a serious risk

6  that a joint trial would compromise a specific trial right of one of the defendants, or [would]

7  prevent the jury from making a reliable judgment about guilt or innocence."  *United States v.*

8  *Stinson*, 647 F.3d 1196, 1205 (9th Cir. 2011) (quoting *Zafiro*, 506 U.S. at 539).  "When the reason

9  for severance is the need for a codefendant's testimony, the threshold showing required of the

10  defendant is (1) that he would call the defendant at a severed trial, (2) that the codefendant would

11  in fact testify, and (3) that the testimony would be favorable to the moving party."  *United States*

12  *v. Reese*, 2 F.3d 870, 892 (9th Cir. 1993) (citing *United States v. Hernandez*, 952 F.2d 1110, 1115

13  (9th Cir. 1991), *cert. denied*, 506 U.S. 920 (1992)) (cleaned up).

14  **DISCUSSION**

15    I.    **MOTION TO DISMISS**

16      Defendants seek to dismiss Counts One and Two on the grounds that they violate the Rule

17  Against Duplicity and are impermissibly vague.  Under Federal Rule of Criminal Procedure 8(a),

18  an indictment may charge a defendant with two or more offenses in a singular count only "if the

19  offenses charged—whether felonies or misdemeanors or both—are of the same or similar

20  character, or are based on the same act or transaction, or are connected with or constitute parts of a

21  common scheme or plan."  Fed. R. Crim. P. 8(a).  An indictment does not violate the Rule Against

22  Duplicity if a one count charges a "conspiracy to commit more than one offense."  *United States v.*

23  *Smith*, 891 F.2d 703, 713 (9th Cir. 1989), *as amended*, 906 F.2d 385 (9th Cir. 1990) (citing

24  *Braverman v. United States*, 317 U.S. 49, 54 (1942)).  But a conspiracy *does* violate the Rule if a

25  single count charges multiple, distinct conspiracies.  *See United States v. Gordon*, 844 F.2d 1397,

26  1401 (9th Cir. 1988).

27      The parties primarily dispute whether the GoldenSpear, AI Health, and PPP loan schemes

28  should be considered as one conspiracy or three distinct conspiracies.  They agree that if the three

United States District Court
Northern District of California

7

schemes are considered independent conspiracies, Counts One and Two would violate the Rule Against Duplicity.  Conversely, should I find that the schemes are part of one conspiracy, the Rule Against Duplicity would not apply, and Counts One and Two would be properly alleged.

### a.  Count One Does Not Violate the Rule Against Duplicity.

Count One charges the Sotos with conspiracy under 18 U.S.C. § 371.  Indict. ¶¶ 34–37. Specifically, the Indictment alleges:

> 35. Beginning no later than in or about March 2017, and continuing until at least in or about May 2022, in the Northern District of California and elsewhere, [defendants] did knowingly conspire to commit offenses against the United States, namely devising and intending to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

> 36. The objectives of the conspiracy were, among other things, (a) to obtain investment funds in GoldenSpear and AI Health from investors using false and misleading statements, and omissions of material facts; (b) to obtain funds from a PPP loan to Lender 1 using false and misleading statements, and omissions of material facts.

> 37. In furtherance of the conspiracy and to effect the objects thereof, in the Northern District of California and elsewhere, [defendants] and others committed the following overt acts:

> a.      On or about January 17, 2018, SAINTS SOTO wrote an email to T.G. that contained false and misleading statements, including falsely stating that GoldenSpear had been "selected" by Car Manufacturer 1 to "power a global intelligent Dealership Network" and falsely stating that Financial Firm 1 had taken GoldenSpear on a "roadshow" to meet prominent technology companies in 2017 and that many of the technology companies "made known their interest to make an acquisition and/or an investment."

> b.      On or about April 20, 2020, SANTOS SOTO and SAINTS SOTO submitted a PPP loan application to Lender 1 that included false statements including, but not limited to, the number of

> GoldenSpear employees based in the United States, how much GoldenSpear paid its United States-based employees, and GoldenSpear's commercial office space expenditures.
>
> c.    On or about January 6, 2022, SANTOS SOTO wrote an email to E.C. that contained false and misleading statements, including providing a contract purporting to be a finalized agreement between Medical Device Company 1 and AI Health that was not.

*Id.* ¶¶ 35–37.

Defendants contend that the text and structure of Count One suggest that the three alleged schemes are independent conspiracies violating the Rule Against Duplicity.  *See* Dismiss Mot. at 4.  They point out that Count One "expressly admits two distinct objectives" in Paragraph 36—first, to "obtain investment funds in GoldenSpear and AI Health from investors"; and second, to "obtain funds from a PPP loan to Lender 1."  *See id.*; Indict. ¶ 36.  This, along with the incorporated introductory paragraphs "expressly distinguish[ing]" between the three schemes, suggests to defendants that the Indictment understood these schemes as separate conspiracies. Dismiss Mot. at 4; *see* Indict. ¶¶ 13–17 (discussing only the GoldenSpear incident); ¶¶ 18–26 (discussing only the AI Health incident); ¶¶ 27–33 (discussing only the PPP loan incident).

Defendants primarily rely on *United States v. Gordon* to frame their analysis.  844 F.2d 1397 (9th Cir. 1988).  In *Gordon*, the defendants were charged with one count of conspiracy to defraud the United States premised on two separate incidents—first, an agreement to "use inside information to secure government contracts . . . in return for payoffs"; and second, "to conceal, cover up; and obstruct an investigation . . . into that wrongdoing."  844 F.2d at 1401.  The Ninth Circuit concluded that these two incidents were separate incidents, as no evidence suggested the defendants "contemplated or discussed any plans for a coverup."  *Id.*  Rather, it was only until one co-defendant was subpoenaed by a grand jury that the conspiracy to obstruct justice began.  *See id.* In so holding, the Ninth Circuit held that the "relevant factors in determining the existence of [one versus multiple circumstances] are [1] the nature of the scheme, [2] the identity of the participants, [3] the quality, frequency, and duration of each conspirator's transactions, and [4] the commonality of times and goals."  *Id.*

Applying *Gordon*'s "relevant factors" analysis to this case, defendants assert that Count

One is duplicative.  With respect to the "nature of the scheme" factor, they argue:

> [I]t could not possibly have been anticipated at the time of the commencement of the alleged GoldenSpear investor fraud scheme in March 2017 that three years later there would be a global COVID-19 pandemic starting in March 2020, let alone that a Paycheck Protection Program would subsequently be instituted to provide emergency financial assistance to those suffering the economic effects of that pandemic.

Dismiss Mot. at 5.  They similarly assert that the "quality, frequency, and duration" and "commonality of time and goals" factors weigh against finding one single conspiracy, as each scheme involved "non-overlapping dates and distinct unrelated victims."  *Id.* at 4–6.  Finally, while defendants were allegedly both involved in all three schemes, they claim this fact is inconclusive, as "involvement of identical conspirators in both conspiracies does not compel a finding that a single conspiracy existed."  *Id.* at 6 (citing *United States v. Ziskin*, 360 F.3d 934, 945 (9th Cir. 2003)).

Defendants' reliance on *Gordon* now is likely misplaced.  As the court noted in *United States v. W.R. Grace*:

> The *Gordon* court expressly stated that it was not considering an objection to the form of the indictment, and made clear that objections to the form were to be resolved pursuant to the "limited review" test. Instead, the *Gordon* court was assessing whether the defendants were subjected to the risk of a non-unanimous jury verdict. The relevant factors test it employed in making that assessment is markedly of a different character than the limited review test associated with pretrial challenges for duplicity. This distinction is apparent from the *Gordon* court's application of the relevant factors test, for which the court relied upon a review of the evidence at trial. 844 F.2d at 1401 ("The evidence does not show that the parties contemplated or discussed any plans for a coverup."). At the pretrial stage, during which a challenge to the form of the indictment must be raised under Rule 12(b)(2), it is impossible for the court to consider the evidence heard at trial.

429 F. Supp. 2d 1207, 1218 (D. Mont. 2006).

The "relevant factors" test, the court in *W.R. Grace* concluded, applies in cases where the government charges a single conspiracy but the defendant "alleges a variance between the charge and the proof *at trial* because the proof has shown that the conduct charged constitutes more than

one conspiracy." *Id.* (emphasis added). By contrast, the court in *W.R. Grace* found that a "limited review" test applies to duplicity challenges for indictments at the pre-trial stage. *See id.* This "limited review" test requires district courts to "solely . . . assess whether the indictment itself can be read to charge only one violation in each count." *Id.* at 1219 (citing *United States v. Martin*, 4 F.3d 757, 759 (9th Cir. 1993)).

I agree with the *W.R. Grace* court that a "limited review" test likely applies at this stage of the proceeding. The *Gordon* test appears more applicable for post-trial considerations of the indictment, as more evidence has been presented and could be considered under the higher standard of review. At the pre-trial stage, however, less evidence is present for me to consider whether the Indictment is duplicative.

Applying *W.R. Grace* to the Indictment, Count One would not be duplicative. To start, the named conspirators remain the same in each overt act. When "read in its entirety [and] construed according to common sense," the Indictment plausibly alleges that the COVID-19 pandemic did not "discontinue [the conspiracy's] initially agreed upon objective," but rather allowed defendants to adapt the tools and means by which they engaged in fraud. *Id.*; *Berger*, 473 F.3d at 1103. The Indictment explains defendants' connections to GoldenSpear, as well as the purported incidents of fraud that spanned between 2017 and March 2020. *See* Indict. ¶¶ 1–4, 13–17. It then details how "after the onset of the COVID-19 pandemic, [defendants] began to represent to potential investors that GoldenSpear was moving from the fashion sector to the health sector," and created AI Health as a result. *See id.* ¶ 18. Accordingly, the Indictment sufficiently tracks how the purported GoldenSpear fraud evolved into the AI Health scheme. *See id.*

There also is a clear connection between the GoldenSpear and PPP loan incidents. The Indictment explains that the PPP scheme was directly connected to GoldenSpear, as without the company, defendants could not apply for the loan. *See* Indict. ¶¶ 27–33. By using false information about the state of GoldenSpear in 2020, defendants were able to successfully receive $669,770 in emergency loans that were ultimately wired to their jointly-held GoldenSpear bank account. *Id.* ¶ 31. Count One then explains that defendants are charged with a conspiracy to defraud both investors and lenders due to their false representations and statements. *Id.* ¶¶ 35–37.

With this information, the Indictment could reasonably be understood as charging only one conspiracy. *See Martin*, 4 F.3d at 759.

Even assuming defendants are correct that *Gordon* applies, Count One would not be duplicative. Their arguments are largely premised on the fact that the three schemes occurred in distinct time periods and with distinct victims, and that defendants could not have anticipated the COVID-19 pandemic—and thus the AI Health and PPP loan schemes—when entering the purported GoldenSpear conspiracy in 2017. *See id.* I do not disagree that defendants could not have anticipated the COVID-19 pandemic. But a "single overall agreement need not be manifested by continuous activity," and a "suspension of activities" does not necessarily "divide a conspiracy into more than one." *United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir. 1982), *abrogated on other grounds*, *United States v. Jimenez Recio*, 537 U.S. 270, 277 (2003). Rather, conspiracies are "presumed to continue unless there is affirmative evidence that the defendant abandoned, withdrew from, or disavowed the conspiracy or defeated its purpose." *United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980). I agree with the government that the Indictment does not suggest abandonment or withdrawal from the GoldenSpear conspiracy—rather, it shows "defendants were . . . committed to using misrepresentations about their business enterprises to obtain money by means of wire communication." *See* Oppo. at 10. While the tools and circumstances admittedly changed, the "underlying objects of the agreement" plausibly appear to remain the same. *Id.* Accordingly, any temporal "gaps" between the three schemes does not automatically support finding duplicity.

Defendants also argue that the three schemes each had "different goals and distinct types of transactions," considering the GoldenSpear and AI Health schemes allegedly involved wire fraud, while the PPP loan scheme involved bank fraud. Dismiss Mot. at 6; *see* Indict. ¶ 36. They claim that this appears on the face of Count One, which divides the bank and wire fraud schemes into "two distinct objectives" of the conspiracy. Dismiss Mot. at 4. But again, while the means of the conspiracy may have differed over time, the overall goal—for defendants to obtain funds by using false and misleading statements about their companies—appears the same throughout the Indictment. Count One can plausibly be read as alleging one conspiracy and is not duplicative.

### b.  Count Two Does Not Violate the Rule Against Duplicity.

Count Two charges defendants with conspiracy to commit wire fraud.  *See* Indict. ¶¶ 38–39.  Unlike Count One, Count Two provides a "bare-bones recitation of the charged statute" and "incorporates by reference" the introductory paragraphs and Count One.  *See* Dismiss Mot. at 8–9. Because Count Two is largely coextensive with Count One, defendants conclude that if Count One is found duplicative, so must Count Two.  *Id.* at 9.

As explained above, the three alleged schemes are plausibly alleged as one conspiracy, meaning Count One does not violate the Rule Against Duplicity.  Because Count Two directly incorporates Count One and addresses the same scheme, it also does not violate the Rule Against Duplicity.

### II.  MOTION TO STRIKE

### A.  Non-Disclosure Theory

Defendants request that I strike the "non-disclosure" theory of wire fraud from Counts One through Five of the Indictment.  I decline to do so.  The government has provided sufficient facts in their Indictment to support a prosecution under this theory.

To begin, the parties agree that a wire fraud charge may be premised on either a theory of affirmative representation or of "non-disclosure."  *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016); *see* Strike Mot. at 2; Oppo. at 21.  They also agree that a "non-disclosure" theory can only support a wire fraud charge "when there exists an independent duty that has been breached by the person so charged."  *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (quoting *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985)).  Where they disagree is whether the duty to disclose is an implied necessary element of a wire fraud charge.

Defendants claim that when the government premises a wire fraud charge on a theory of non-disclosure, it must include in the charges the "implied essential element of a duty to disclose." Strike Mot. at 1–2; *Eller*, 778 F.3d at 1092.  They cite a string of cases striking down wire fraud charges under a non-disclosure theory for a failure to plead a duty to disclose.  *Id.* at 2–3; *see, e.g.*, *United States v. Lonich*, No. 14-cr-00139-SI-1, 2016 WL 324039, at *6–*8 (N.D. Cal. Jan. 27,

2016); *United States v. Sullivan*, No. 20-cr-0037-WHO-1, 2022 WL 2317441, at *7–*8 (N.D. Cal. June 28, 2022); *United States v. Galloway*, No. CR 14-607 PJH, 2016 WL 4269961, at *2–*4 (N.D. Cal. Aug. 15, 2016). And because the Indictment "fails to allege" this duty, defendants argue, charges under the non-disclosure theory must be dismissed. Strike Mot. at 2; *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999).

In response, the government claims that it is not necessary to allege a duty to disclose to prosecute a non-disclosure theory of wire fraud. *See* Oppo. at 22–23. They contend that the Ninth Circuit has not opined on the issue, and that defendants lack circuit authority supporting their claim. *See id.* Assuming it is required, however, the government maintains that it has met its burden. *See id.*

Defendants are correct that many courts require the government to assert a duty to disclose in wire fraud charges premised on a non-disclosure theory. *See Lonich*, 2016 WL 324039, at *7–*8. In *Lonich*, for example, the defendants—the CEO and President of Sonoma Valley Bank ("SVB"), the Senior Vice President and Chief Loan Officer of SVB, and an attorney—were accused of conspiracy to commit wire fraud after convincing SVB to approve a loan that violated the bank's legal lending limit. *Id.* at *2. The government's wire fraud claims were premised in part on a theory of non-disclosure. *See id.* at *7. However, the "only specific omission alleged in the indictment" was that the defendants "omitted the material fact" to SVB that the parties seeking the loan were subjects of a criminal investigation. *Id.* Despite the specific allegations of non-disclosure, the court concluded that the indictment failed to sufficiently allege that the defendants owed a duty to disclose information to the SVB. *See id.* at *8.

But the government is also correct that courts should construe indictments broadly when determining whether a duty to disclose has been included. *See United States v. Milovanovic*, 678 F.3d 713, 723–24 (9th Cir. 2012); *United States v. Losch*, 2022 U.S. Dist. LEXIS 103425, *7 (D. Ariz. June 9, 2022); *see also United States v. Shields*, 844 F.3d 819, 822–23 (9th Cir. 2016) (adopting *Milovanovic* to wire fraud charges). In *Losch*, an indictment charging a CEO with wire fraud alleged that the defendant "was central to solicitation pitches," "spoke directly and often with potential investors," and was "instrumental in soliciting investments into [his company]."

2022 U.S. Dist. LEXIS 103425, at *7 (cleaned up).  Applying *Milovanovic*, the court concluded that these allegations alone were sufficient to support a duty to disclose theory, as the indictment demonstrated that the defendant had a "trusting relationship" with the victims, which caused them to "relax the care and vigilance [they] would ordinarily exercise."  *Id.*[3]

Assuming that there is a duty to disclose, when reading the indictment "in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied," the government has met its burden.  *United States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985).[4]  The Indictment alleges that defendants held influential positions within GoldenSpear and AI Health, just like the CEO in *Losch*.  *See* Indict. ¶¶ 1, 3.  It also claims that the pair began using their statuses as "leaders in the company" to make false representations to multiple investors, who in turn relied on their claims as being "credible."  Oppo. at 24; *see* Indict. ¶¶ 14–26, 30–32, 35, 39, 41, 43, 45–47.  As a result, the Indictment concludes that defendants built a "trusting relationship" with the alleged victims, causing them to "relax the care and vigilance [they] would ordinarily exercise."  *See id.*; 2022 U.S. Dist. LEXIS 103425, at *6 (cleaned up).  Accordingly, under *Losch* and *Milovanovic*, the Indictment properly pleads enough facts to support a non-disclosure theory of wire fraud.  *See id.*  Defendants' motion to strike the non-disclosure theory is DENIED.

### c.  "Among Other Things"

Defendants also request that I strike the "vague phrase 'among other things' from Count One (paragraph 36) because it permits the prosecution to achieve a conviction based on facts and

---

[3] Defendants argue that *Losch* is not controlling because it does "not cite authority from any jurisdiction in support of its conclusion that the element of a duty to disclose need not be pleaded in an indictment charging wire fraud under a non-disclosure theory."  Strike Repl. at 3 n.3.  To the contrary, *Losch* directly cites the holding in *Milovanovic* that evidence of an informal, "trusting relationship" where the defendant "induces the trusting party to relax the care and vigilance which it would ordinarily exercise" is enough to support a non-disclosure theory under Federal Rule of Criminal Procedure 7(c)(1).  *See* 2022 U.S. Dist. LEXIS 103425, at *6–*7; 678 F.3d at 724; Fed. R. Crim. P. 7(c)(1).

[4] Defendants maintain that *Givens* is superseded by *United States v. Du Bo*, which held that "an indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment."  *See* Strike Repl. at 2 n.2; 186 F.3d 1177, 1179 (9th Cir. 1999).  I do not read these cases to be mutually exclusive.  While *Du Bo* focuses on *when* courts may dismiss an improperly alleged indictment, *Givens* explains *how* an indictment should be read to determine the sufficiency of the claims.  *Givens* is good law and must be followed.

theories not found by the grand jury, which would violate the Fifth Amendment." Dismiss Mot. at 8. The government did not squarely address this issue in its opposition.

To support their argument, defendants cite to *Lonich*, which concluded that the language "among other things" in an indictment "adds nothing to the charges, gives the defendants no further information with respect to them, and creates the danger that the prosecutor at trial may impermissibly enlarge the charges in the Indictment returned by the grand jury." 2016 WL 324039, at *6 (quoting *United States v. DePalma*, 461 F. Supp. 778, 798–99 (S.D.N.Y. 1978)). I agree with the defendants that *Lonich* controls here, and that the "among other things" language is surplusage. *See id.* The government's theory of conspiracy can reasonably be understood even when limiting the scope of the charge to the two listed objectives in Paragraph 36. Therefore, defendants' motion to strike the "among other things" language is GRANTED.

## III.    MOTION TO SEVER

Defendants finally request that Counts Six and Seven be severed from the remainder of the Indictment, and that those counts be tried separately as to each defendant. I agree with the government that joinder of the counts does not appear prejudicial. However, with respect to severance of the defendants' trials, I do not currently have enough information to decide whether severance is warranted. As I explain below, there are significant concerns about both prejudice and judicial economy that remain unresolved. Accordingly, I DENY defendants' motion at this time but will reconsider this issue closer to trial.

### A.    Severance of Counts Six and Seven from the Indictment is Unnecessary.

Under Federal Rule of Criminal Procedure 8(a), joinder of two or more offenses is proper when the offenses charged are "of the same or similar character, or are based on the same acts or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Only one of these three prongs must be found for joinder to be proper. *See United States v. Jawara*, 474 F.3d 565, 578 (9th Cir. 2007). This liberal standard applies because joinder "is the rule, severance the exception." *United States v. Free*, 841 F.2d 321, 324 n.1 (9th Cir. 1988). But these factors are "not infinitely elastic," and there must be a "valid basis for joinder . . . discernible from the face of the indictment." *Jawara*, 474 F.3d at 473 (citing *United States v. Randazzo*, 80

1   F.3d 623, 627 (1st Cir. 1996)).

2       Here, the government invokes two of the three bases for joinder—that Counts Six and

3   Seven are "of the same or similar character" as the other counts, and that all seven counts are

4   "connected with or constitute parts of a common scheme or plan."

5                              **i.  Same or Similar Character**

6       Both parties agree that *Jawara* sets forth the standard for determining whether two claims

7   are of a "same or similar character" under Rule 8(a).  *See* Strike Mot. at 4; Oppo. at 15–16.  In

8   *Jawara*, the Ninth Circuit held that in determining whether two or more claims are "same or

9   similar in character," district courts must consider "[1] the elements of the statutory offenses, [2]

10  the temporal proximity of the acts, [3] the likelihood and extent of evidentiary overlap, [4] the

11  physical location of the acts, [5] the modus operandi of the crimes, and [6] the identity of the

12  victims."  474 F.3d at 577.

13      Defendants maintain that none of the facts in *Jawara* support joinder.  Sever Mot. at 10.

14  First, they point out that the victims in Counts Six and Seven—the United States—are different

15  from the investor victims in Counts One through Five.  *Id.*  Each scheme also occurred at different

16  times.  *Id.*  They further allege that the use of a computer in the PPP loan scheme, but "puffery" in

17  the GoldenSpear and AI Health schemes, suggests that the modus operandi of the crimes are

18  distinct.  *Id.*  And because the facts defendants allegedly used to defraud in Counts Six and

19  Seven—incorrect statistics about GoldenSpear's payroll and number of U.S.-based workers—were

20  never used in Counts One through Five, no evidentiary overlap exists between the claims.  *Id.*

21      The government conversely argues that enough similarities exist between the claims to

22  support joinder.  *See* Oppo. at 15–16.  For example, Count Six (bank fraud) includes many of the

23  same elements as Counts Three through Five (wire fraud), such as "a materially false statement, an

24  intent to defraud and intent to deceive and cheat, and the obtaining of money or property through

25  the false statements."  *Id.* at 16.  Similarly, the time frames of the schemes are "relatively close" to

26  each other, despite not overlapping.  *Id.*  The "modus operandi" of each scheme revolves around

27  defendants making "materially false statements about the nature, operations, and technology of

28  GoldenSpear and AI Health."  *Id.*  And much of the evidence supporting Counts Six and Seven

17

overlaps with the other charges, including details about GoldenSpear's operations, and defendants' knowledge of the three schemes.  *Id.*

Restricting my inquiry to the allegations in the Indictment, all seven counts appear to be of a "same or similar character."  Unlike in *Jawara*, where the two joined counts had no overlapping elements, here, Count Six shares multiple distinct elements with Counts Three through Five.  *See id.*; 474 F.3d at 578.  While defendants emphasize the temporal difference between the three schemes, *Jawara* makes clear that this factor is less important when the counts "stem from common events."  *See* Oppo. at 16; 474 F.3d at 578–79.  And as the government correctly argues, the three schemes, as alleged in the Indictment, plausibly arise out of the same modus operandi— the use of false statements about GoldenSpear and AI Health to defraud others.  *See* Oppo. at 16.

Defendants' use of *Jawara* is also incorrect.  They repeatedly cite to language in *Jawara* that suggests a "vague thematic connection" between crimes does not support joinder, and that the Indictment is only vaguely connected by "fraud" in the abstract.  *See* 474 F.3d at 579; Sever Mot. at 11; Repl. at 7.  But the facts in *Jawara* are notably different from this case.  There, the two joined fraud schemes were "vastly different": one involved "lying about being from Sierra Leone on an asylum application," while the other involved "procuring meetings" to facilitate sham marriages.  *Jawara*, 474 F.3d at 578-79.  The indictment also "evince[d] no similar mode of operation" between the two crimes—the only similarity was that both schemes involved immigration.  *Id.* at 579.  Here, however, the Indictment plausibly shows that all three schemes are connected by "materially false statements about the nature, operations, and technology of GoldenSpear and AI Health."  *See* Oppo. at 16.  Because such facts plausibly appear on the face of the Indictment, *Jawara* is distinguishable, and joinder is proper.  *See id.*; 474 F.3d at 579.

### 1.    Common Scheme or Plan

Under the "common scheme or plan" factor, joinder is generally permitted when multiple counts "grow out of related transactions."  *Jawara*, 474 F.3d at 574 (citing *Randazzo*, 80 F.3d at 627).  In other words, district courts must find that "commission of one of the offenses either depended upon or necessarily led to the commission of the other," and that "proof of one act neither constituted nor depended upon proof of the other."  *Id.* (citing *United States v. Halper*, 590

1    F.2d 422, 429 (2d Cir. 1978) (citation modified)).

2         With respect to this factor, defendants contend that Counts Six and Seven "allege an

3    isolated wrongdoing," and that the "sole connection" between these counts with the rest of the

4    indictment is that GoldenSpear "is the entity that the PPP loan relates to." Sever Mot. at 7.

5    Because the Indictment does not allege "any connection whatsoever [between] this loan

6    application and any of the Soto's dealings with GoldenSpear or AI Health investors," defendants

7    conclude, no nexus exists to prove a common scheme or plan. *Id.*

8         To support their argument, defendants cite *United States v. Halper*, 590 F.2d 422 (2d Cir.

9    1978). In *Halper*, the Second Circuit found that the defendant's tax evasion and Medicaid fraud

10   charges were improperly joined because their connection was "entirely too speculative to justify

11   joinder." 590 F.2d at 429. But *Halper* is readily distinguishable. It does not procedurally address

12   the issue in this case: whether joinder is proper under Rule 8(a). *See id.*; *United States v. Krug*,

13   198 F. Supp. 3d 235, 249 n.5 (W.D.N.Y. 2016). Rather, "*Halper* concerned whether two

14   indictments, each charging distinct conduct, were properly joined under Rule 13." *Krug*, 198 F.

15   Supp. 3d at 248 n.5.[5]

16        Moreover, the facts of *Halper* are distinguishable. In *Harper*, the government alleged that

17   the defendant's Medicaid fraud "produced the income" he later used to commit tax evasion, but it

18   ultimately conceded that it could not prove this connection. *See* 590 F.2d at 429. Here, by

19   contrast, Counts Six and Seven charge conduct so closely connected to that in Counts One through

20   Five that they can be deemed part of the same scheme—"obtaining money through false

21   representations about the GoldenSpear business." *See id.*; Oppo. at 17.

22        Defendants' reliance on *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999), is also

23   misplaced. In *Sarkisian*, the Ninth Circuit found that the joinder of an extortion and auto part

24   trafficking charge was improper because there were no "meaningful connections" between the

25   charges. 197 F.3d at 976. However, joinder in *Sarkisian* was challenged under Federal Rule of

---

[5] While Rule 13 is "informed by Rule 8," the two rules apply different standards that may not
always reflect one another. *Id.*; *see, e.g.*, *Halper*, 590 F.2d at 428 ("[E]ven if the offenses could
have been joined in a single indictment under Rule 8(a), the trial court is not automatically free to
order the indictments tried together under Rule 13.").

United States District Court
Northern District of California

1    Criminal Procedure 8(b)—governing joinder of multiple defendants—not Rule 8(a). *Id.* at 975.

2    Rule 8(b) contains no similar language concerning a "common scheme or plan," making

3    defendants' use of this case inapposite. *See* Fed. R. Crim. P. 8(b).

4         Finding the case law cited by defendants unpersuasive, I turn again to *Jawara*. For joinder

5    to be proper under a "common scheme or plan," the government must show that the counts "grow

6    out of related transactions." *Id.* 474 F.3d at 574. Such connections must go "beyond mere

7    thematic similarity." *Id.*

8         The government has met its burden here. First, as described above, the Indictment

9    sufficiently alleges that the GoldenSpear and AI Health schemes were "logically and factually

10   entwined, as AI Health is the direct offshoot of GoldenSpear." Oppo. at 17; *see* Indict. ¶ 18. The

11   Indictment similarly explains how the PPP loan scheme "gr[e]w out of" the GoldenSpear fraud, as

12   defendants provided false information about GoldenSpear in the PPP application and received

13   improper funding in GoldenSpear's bank account. *Jawara*, 474 F.3d at 574; *see* Indict. ¶¶ 29–30.

14   Finally, the Indictment indicates that the AI Health and PPP loan schemes "gr[e]w out of related

15   transactions" because they reflect a shift by defendants to take advantage of the COVID-19

16   pandemic to continue their original GoldenSpear conspiracy. *Jawara*, 474 F.3d at 574; *see* Indict.

17   ¶¶ 18, 27.

18        This evidence suggests more than a "mere thematic similarity"—it shows a detailed

19   conspiracy connecting the three schemes together. *Jawara*, 474 F.3d at 574. Accordingly, a

20   "common scheme or plan" can be inferred from the Indictment. The claims were properly joined

21   under Rule 8(a).

22        **B.    It is Unclear Whether Severance Under Rule 14(a) is Warranted.**

23        The parties finally dispute whether severance of the defendants' cases for Counts Six and

24   Seven is required under Rule 14(a). Sever Mot. at 11; *see Reese*, 2 F.3d at 892. Defendants argue

25   that severance is necessary because "one of the defendants ("Santos") is prepared to offer

26   substantially exculpatory testimony on behalf of defendant Saints at a separate trial on Counts 6-

27   7." Sever Mot. at 11. Without severance, they conclude, a joint trial on Counts Six and Seven

28   would be unfairly prejudicial. *See id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

To support their argument, defendants rely on *United States v. Reese*. *Id.* at 2; 2 F.3d 870 (9th Cir. 1993). In *Reese*, the Ninth Circuit affirmed that "[w]hen the reason for severance is the need for a codefendant's testimony," the defendant must show "(1) that he would call the [co]defendant at a severed trial, (2) that the codefendant would in fact testify, and (3) that the testimony would be favorable to the moving party." *Id.* at 892 (citing *United States v. Hernandez*, 952 F.2d 1110, 1115 (9th Cir. 1992), *cert. denied*, 506 U.S. 920 (1992)).

Applying *Reese*, defendants conclude that all three factors are met. First, counsel for defendants submitted a declaration confirming that she would, in fact, call Santos Soto as a witness in Saints Soto's trial, should they be severed. *See* Declaration of Elizabeth Falk in Support of Motion to Sever ("Falk Decl.") [Dkt. No. 77] at 1. Additionally, Santos Soto submitted his own declaration which defendants claim contains evidence of "significant, substantial and important exculpatory information" that should be heard at Saints Soto's severed trial. *See* Sever Mot. at 12; Declaration of Santos Rene Soto in Support of Motion to Sever ("Santos Soto Decl.") [Dkt. No. 78-1].[6]

In response, the government calls defendants' efforts to sever a prejudicial, "antagonistic defense strategy." Oppo. at 17. It claims that "Saints Soto plans to blame Santos Soto for the crime, and Santos Soto wants to preserve his ability, at a separate trial, to argue that Saints Soto submitted the false application." *Id.* This alone is insufficient to warrant severance, the government argues—if it were, severance would be allowed whenever a defendant "raises the possibility that a co-defendant would testify in a manner helpful to that defendant." *Id.*

The government maintains that joinder of defendants' trials may not be prejudicial under Rule 14. Rather than sever the cases, the government argues that "careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered," can reduce or eliminate any possibility of prejudice from a joint trial. *Id.* at 18; *United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004), *amended on other grounds*, 425 F.3d 1248 (9th Cir. 2005). As an example, it points to the Ninth Circuit model jury instructions. *See* Oppo. at 18;

---

[6] This information is currently filed *ex parte* and under seal; the government has not reviewed the declaration. *See* Oppo. at 19.

1    Ninth Circuit Model Criminal Jury Instruction No. 6.11 ("A separate crime is charged against the

2    defendant in each count.  You must decide each count separately.  Your verdict on one count

3    should not control your verdict on any other count.").

4         After reviewing Santos Soto's declaration, I agree with defendants that the *Reese* factors

5    are met.  But this is not the end of my inquiry.  I must also consider the questions of judicial

6    economy and prejudice, which currently pull in opposite directions.  With respect to prejudice, it

7    appears that the testimony Santos Soto seeks to present in a separate trial may be exculpatory; as a

8    result, it would be prejudicial to exclude such testimony, should a joint trial occur.  This certainly

9    weighs strongly in favor of severance.

10        Where I have difficulty is how to evaluate the question of judicial economy, which also

11   implicates prejudice to the government.  Defendants claim that the "costs of severed trials on the

12   PPP allegations will be fairly modest as the factual and legal issues . . . are straightforward and

13   discrete."  Sever Mot. at 12.  They also argue that the "documentary evidence regarding this single

14   loan is not voluminous," and that a separate trial on these issues "should only last a few days, at

15   most."  *Id.* at 12–13.  Finally, they cite to authority suggesting that judicial economy "cannot

16   become a talisman in the severance analysis," as "judicial economy will always weigh against a

17   severance because one trial is always more economical than two."  *Id.* at 6 (citing *United States v.*

18   *McCord*, No. CR 16-00984-TUC-RM(EJM), 2016 WL 8669900, at *8 (D. Ariz. Sept. 23, 2016)).

19        I need to better understand the evidence that will be presented at trial on this claim and the

20   effect on the trial plan if I grant severance.  It would seem that at least three trials would be

21   required in that event—one jointly trying Counts One through Five, one for Saints Soto on Counts

22   Six and Seven, and one for Santos Soto on Counts Six and Seven.  Would the trials on Counts Six

23   and Seven precede the trial on Counts One through Five?  How would the verdicts on Counts Six

24   and Seven impact the trial on the other counts?  Or vice versa?  Is defendants' current

25   characterization of the severed trials accurate?  Is there a risk of inconsistent verdicts if three trials

26   occur?

27        These questions were not discussed in the motion or at the hearing.  At this point,

28   discovery has not concluded, and more factual and legal questions may arise with respect to the

United States District Court
Northern District of California

22

PPP loan applications. What may seem to be a "straightforward and discrete" issue now may not be in light of all the evidence. *See* Sever Mot. at 12. These are serious concerns, and I do not think they are merely a "talisman in the severance analysis." *See* Sever Mot. at 6.

Because of these issues, I will not resolve the Rule 14(a) issue until a more developed record is available to weigh the prejudicial effects of joinder versus the prejudicial effects and complications the severed trials would bring. Defendants should raise this issue again when the trial(s) schedule is discussed after discovery is complete.

## CONCLUSION

Defendants' motions to dismiss, sever, and strike the non-disclosure theory of fraud are DENIED. Their motion to strike the "among other things" language in Count Two is GRANTED.

**IT IS SO ORDERED.**

Dated: October 30, 2025

William H. Orrick
United States District Judge